AIMCOR, ALABAMA SILICON, INC., AMERICAN ALLOYS, INC., GLOBE METALLURGICAL, INC., AND AMERICAN SILICON TECHNOLOGIES, PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND COMPANHIA FERROLIGAS MINAS GERAIS-MINASLIGAS, DEFENDANT-INTERVENOR

Consolidated Court No. 94–03–00182

(Dated July 20, 1995)

*Baker & Botts, L.L.P. (William D. Kramer, Charles M. Darling, IV* and *Martin J. Schaefermeier)* for plaintiff.

*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(John K. Lapiana), Dean A. Pinkert* and *Alexandra Levinson,* Attorney Advisors, Office of Counsel, United States Department of Commerce, of counsel, for defendant.

*Dorsey & Whitney (Munford Page Hall, II, Philippe Bruno* and *Robert W. Bras)* for defendant-intervenor.

### OPINION

RESTANI, *Judge:* This matter is before the court on motions for judgment upon the agency record pursuant to USCIT 56.2 by plaintiffs AIM-

---

COR; Alabama Silicon, Inc.; American Alloys, Inc.; Globe Metallurgical, Inc.; and American Silicon Technologies (collectively "AIMCOR"), and defendant-intervenor Companhia Ferroligas Minas Gerais-Minasligas ("Minasligas"). The motions challenge various portions of the determination by the International Trade Administration of the United States Department of Commerce ("ITA" or "Commerce") in *Ferrosilicon from Brazil*, 59 Fed. Reg. 732 (Dep't Comm. 1994) (final determ. of less than fair value ("LTFV") sales) *("Final Det.")* and in *Ferrosilicon from Brazil*, 59 Fed. Reg. 8598 (Dep't Comm. 1994) (amended final determ.) *("Amended Final Det.")*.

## FACTS

On January 12, 1993, AIMCOR; the Oil, Chemical and Atomic Workers, Local 389; the United Autoworkers of America, Local 523; and the United Steelworkers of America, Locals 2528, 3081, 5171 and 12646 (collectively "petitioners"), filed a petition alleging that ferrosilicon ("FeSi") imports from Brazil were being, or were likely to be, sold at LTFV. FeSi, a ferroalloy produced by combining silicon and iron through smelting, is used primarily as an alloying agent in steel and cast iron production. The steel industry uses FeSi as a deoxidizer and a reducing agent. Cast iron producers employ FeSi as an inoculant.[1] The merchandise subject to investigation by Commerce consisted of,

> by weight, not less than four percent iron, more than eight percent but not more than 96 percent silicon, not more than 10 percent chromium, not more than 30 percent manganese, not more than three percent phosphorous, less than 2.75 percent magnesium, and not more than 10 percent calcium or any other element.

*Final Det.* at 732. FeSi is differentiated by size, depending upon the maximum and minimum dimensions of FeSi lumps found in a given shipment, and by grade, defined as the percentage by weight of contained silicon and other minor elements. *Id.* In the iron and steel industries, sales of FeSi are commonly in standard grades of 50 percent and 75 percent FeSi. *Id.*

After initiation of an antidumping duty investigation for the period July 1 through December 31, 1992, Commerce preliminarily determined that Companhia Brasileira Carbureto de Calcio ("CBCC") and Minasligas (collectively "respondents") had made FeSi sales at LTFV.[2] 58 Fed. Reg. at 43,327. In its final determination, Commerce concluded that imports of FeSi from CBCC were made at LTFV. *Final Det.* at 739. FeSi imports by Minasligas, however, were not found to have been made at LTFV. *Id.* at 739–40.

---

[1] An inoculant is defined as a substance "which augments a melt, usually in the latter part of the melting operation, thus altering the solidification structure of the cast metal." *McGraw-Hill Dictionary of Scientific and Technical Terms* 819 (3d ed. 1984).

[2] Commerce also preliminarily determined that Italmagnesio S.A. Industria e Comercio ("Italmagnesio") imported FeSi at LTFV. *Ferrosilicon from Brazil*, 58 Fed. Reg. 43,323, 43,327 (Dep't Comm. 1993) (prelim.). Prior to Commerce's final determination, however, Italmagnesio withdrew from its participation in the LTFV investigation. Thus, as a non-cooperating party, Italmagnesio was assigned the most adverse best information available, utilizing information contained in petitioners' cost of production allegation for its dumping margin. *See Final Det.* at 732, 739.

Petitioners, CBCC and Minasligas submitted comments on January 21 and January 24, 1994, alleging ministerial errors in the final determination. Commerce amended its final determination finding sales of LTFV imports by CBCC and Minasligas, to incorporate correction of several alleged ministerial errors. *Amended Final Det.* at 8599. An antidumping duty order was issued on March 14, 1994. *Ferrosilicon from Brazil,* 59 Fed. Reg. 11,769 (Dep't Comm. 1994). AIMCOR, domestic producers of FeSi, and CBCC and Minasligas, Brazilian FeSi producers, filed challenges with this court contesting certain portions of Commerce's final determination. These actions were consolidated on June 9, 1994.[3]

## STANDARD OF REVIEW

In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those determinations by Commerce found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C.A. § 1516a(b)(1)(B)(i) (West Supp. 1995)). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

## DISCUSSION

I. *Minasligas' Contentions:*

A. Home market credit expenses:

1. Commerce's cost of production analysis:

Determining that reasonable grounds existed to believe or suspect that Minasligas' home market sales were made at less than the cost of production ("COP"), Commerce conducted a COP investigation in the original final determination pursuant to 19 U.S.C. § 1677b(b) (1988).[4] *Final Det.* at 733. After comparing individual home market prices with monthly COPs,[5] Commerce determined that between 10 and 90 percent of Minasligas' home market sales were above COP. *Id.* at 734. Disregarding below-COP sales, Commerce used Minasligas' above-COP sales as the basis for determining foreign market value ("FMV"). *Id.* at 734–35.

---

[3] On November 14, 1994, this action was dismissed as to CBCC.

[4] The statute, in pertinent part, provides:

If the administering authority determines that sales made at less than cost of production—
 (1) have been made over an extended period of time and in substantial quantities, and
 (2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade

such sales shall be disregarded in the determination of foreign market value. Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than cost of production, are determined to be inadequate as a basis for the determination of foreign market value * * * the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.

19 U.S.C. § 1677b(b) (current version at 19 U.S.C.A. § 1677b(b) (West Supp. 1995)).

[5] Commerce calculated monthly COPs on the basis of Minasligas' cost of materials, fabrication, general expenses, and packing expenses. *Final Det.* at 734. Commerce made other adjustments where Minasligas' reported costs were not appropriately quantified or valued. *Id.*

Comparison with United States price ("USP")[6] yielded no dumping margin for Minasligas. *Id.* at 739–40.

In their allegation of ministerial errors following the final determination, however, petitioners contended that Minasligas' reported "credit expenses" were in fact an "adjustment for anticipated inflation," and should be excluded from the home market price for purposes of comparison to monthly COPs under the COP test. *Amended Final Det.* at 8598. In general, credit expenses are incurred during the time period between shipment of merchandise to a customer and payment for the merchandise, and reflect the costs of borrowing funds pending receipt of payment or the fact that funds are tied up due to the existence of accounts receivable. *See* Int'l Trade Admin., U.S. Dep't of Comm., *Antidumping Manual, Import Administration* ch. 8, at 18 (July 1993) (hereinafter *"Antidumping Manual"*). In this case, Minasligas included a credit charge in customer invoice prices to account for the financial expense of carrying the receivable during the period between shipment and payment by the customer.[7] *See* Concurrence Mem. at 18–19. The record indicates that this negotiated credit charge "reflects the inflation expectation at that time, plus a spread (where appropriate), which is then applied in the invoice to compensate for inflation and credit during the payment period in the home market." *Id.* at 19.

Agreeing with petitioners, Commerce determined that the home market price erroneously included an "adjustment for anticipated inflation," that did not permit a contemporaneous comparison of the home market price "at the time of shipment to the replacement cost in the month of shipment." *Amended Final Det.* at 8598. After correction of this alleged error, recalculation resulted in a finding of no or inadequate above-COP sales for comparison to USP. *Id.* Thus, Commerce based FMV upon constructed value (or "CV") and concluded that Minasligas imported the subject merchandise at LTFV. *Id.* at 8598–99.

Minasligas maintains that Commerce's adjustment for Minasligas' reported "credit expenses" was an abuse of discretion and unsupported by the record evidence. Minasligas contends that Commerce's adjustment to the home market price constituted a methodological change to the final determination, and was not an unintentional ministerial error. Under the statute, Commerce is given fairly broad discretion to determine what constitutes an unintentional ministerial error.[8] *See CEMEX,*

---

[6] Minasligas' USP was based on purchase price, as "the subject merchandise was sold to unrelated purchasers in the United States prior to importation and exporter's sales price was not indicated by other circumstances." *Final Det.* at 733.

[7] Although Minasligas reported this interest charge as a "credit expense," Commerce determined that it was more appropriately characterized as "interest revenue." *See* Def.'s Mem. in Partial Opp'n to Pls.' Mot., Ex. 10, at 19 (hereinafter "Concurrence Mem."). Minasligas indicates, however, that Commerce includes such expenses in the home market price for purposes of comparison in a COP analysis. *See Certain Internal-Combustion, Industrial Forklift Trucks from Japan,* 56 Fed. Reg. 23,675, 23,678 (Dep't Comm. 1991) (prelim.) ("[W]e compared the home market prices, net of inland freight, discounts and rebates, plus credit revenue, to the [COP].").

[8] Commerce may correct "ministerial errors" resulting from

errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

19 U.S.C. § 1673d(e) (1988); 19 C.F.R. § 353.28(d) (1994).

*S.A. v. United States,* Slip Op. 95–72, at 15 (Apr. 24, 1995). As indicated, Minasligas' credit charge to its customers in the home market price contained an interest premium for anticipated inflation. It is Commerce's practice to eliminate the distortive effects of hyperinflationary econo-mies[9] in order to permit fair comparisons of contemporaneous costs and prices. *See, e.g., Porcelain-on-Steel Cooking Ware from Mexico,* 55 Fed. Reg. 21,061, 21,065 (Dep't Comm. 1990) (final results of antidumping duty admin. review); *Tubeless Steel Disc Wheels from Brazil,* 53 Fed. Reg. 34,566, 34,566 (Dep't Comm. 1988) (amended final). Thus, Commerce failed to perceive that it had not followed its policy with regard to hyperinflationary economies and it regarded its failure to adjust the home market price to account for the inflationary interest premium as a ministerial error.[10] Whether or not the error was "ministerial," it was an error which would require correction at some stage of the proceedings.

Minasligas also contests Commerce's adjustment to the home market price, asserting that Commerce deducted all of its reported credit expense, rather than only the portion assignable to the inflationary premium. Although Commerce adjusted Minasligas' home market price consistently with its policy as to hyperinflationary economies, Minasligas points out that the credit rates used by Commerce were the same as those reported by Minasligas. According to Minasligas, this indicates that Commerce likely deducted more than the portion attributable to the inflation premium. The court agrees.

Commerce's questionnaire, to which Minasligas responded, specifically requested data as to the "spread" added to the inflation rate for determination of the interest rate charged to customers. *See* Def.-Int.'s Reply Br., App. 8, at B–5 (supplemental questionnaire response). Minasligas responded that "[f]or almost all transactions during the POI, the credit expenses were based on the inflation rate only. When a 'spread' was added, it was [small]." *Id.* at B–5–B–6. Thus, to the extent that certain credit revenue is attributable to the "spread" charged for certain transactions, this amount should have been included in the home market price. On remand, if the amount of the "spread" is sufficiently quantified, Commerce is directed to account for this amount in the home market price. If this data is not sufficiently quantified, Commerce is directed to grant Minasligas an opportunity to provide such data, as this is the first time an inflationary adjustment of this kind is being made to the home market price, and in light of the belated nature of the adjustment.

Minasligas further contends that if Commerce is to make an inflationary adjustment to the home market price, then a similar adjustment

---

[9] In the final determination, Commerce found Brazil's economy to be hyperinflationary. *Final Det.* at 733.

[10] Minasligas' citation to various determinations, in support of its contention that Commerce's practice is not to deduct home market credit expenses or revenue from the home market comparison price, is inapposite. *See, e.g., Fresh Kiwifruit from New Zealand,* 59 Fed. Reg. 48,596, 48,609 (Dep't Comm. 1994) (final results); *Certain All-Terrain Vehicles from Japan,* 54 Fed. Reg. 4864, 4867–68 (Dep't Comm. 1989) (final determ. of LTFV sales). No determination was made by Commerce in those investigations that the subject country's economy was hyperinflationary, which would require special procedures to avoid distortive pricing effects.

must be made to replacement COP figures for inputs. According to Minasligas, for certain input expenses, such as electricity expenses,[11] suppliers charged inflation-adjusted prices that reflected Minasligas' delayed payment for the input expense. For example, Commerce found that Minasligas' reported electricity expenses incurred for consumption in a given month were not invoiced and paid until the following month.[12] Minasligas asserts that, for purposes of the COP test, Commerce's calculation of such inputs according to its replacement cost methodology, *see supra* note 5, must include a deduction for inflation adjustments already factored into the invoice price.

Both AIMCOR and Commerce rely upon the holding in *Camargo Correa Metais, S.A. v. United States,* Slip Op. 93–163 (Aug. 13, 1993), as rejecting Minasligas' contention that an inflation adjustment should be made for the later-invoiced COP inputs. In *Camargo Correa,* the court upheld ITA's refusal to make a downward adjustment for inflation to invoice prices that already accounted for inflation expected to occur between the time of delivery and the time of payment. *Id.* at 8. The ITA stated that

> [respondent] has indicated that the invoice price is increased by an amount of expected inflation to account for the delayed payment. [Respondent] then has the benefit of earning income on the cash for the period of the delay in payment. The COP is reduced by the amount of this short-term income. [Respondent's] contention that [ITA] should further reduce COP by the amount of the delay in payment would constitute double counting of the benefits from the delay in payment. Accordingly, we did not reduce [respondent's] costs for this adjustment.

*Silicon Metal from Brazil,* 56 Fed. Reg. 26,977, 26,986 (Dep't Comm. 1991) (final determ.). The court in *Camargo Correa* agreed with this reasoning. Slip Op. 93–163, at 8.

Similarly, in this case Minasligas received an offset to COP for documented short-term interest income from investments of working capital.[13] *Final Det.* at 737. As in *Camargo Correa,* the concerns of a double benefit from downward adjustments to COP for short-term interest income and for inflation are present here. Thus, the court finds no error with Commerce's determination as to this issue.

### 2. Commerce's CV calculation:

Minasligas argues that in calculating constructed value (i.e. the sum of replacement cost of materials, labor, factory overhead, general sales and administrative expenses, imputed credit expenses and profit), Commerce failed to make adjustments to Minasligas' imputed home market

---

[11] According to Minasligas, electricity is the major input into FeSi production, accounting for a significant portion of the cost of manufacturing. Def.-Int.'s Mem. P. & A. in Supp. Mot. J. Agency R., App. 8, at 3.

[12] Commerce verified that Minasligas' electricity expense for September 1992 consumption was not invoiced until the following month, October 1992. Def.'s Mem. in Partial Opp'n to Pls.' Mot., Ex. 13, at 9, ¶ 6 ("Cost Verification Report").

[13] Minasligas was only able to substantiate a portion of its investment income as short-term. *Final Det.* at 737.

credit expenses corresponding to the adjustments made to home market sales for COP purposes, thereby overstating the profit calculation and resulting in a non-contemporaneous comparison.[14] According to Commerce, the inclusion of imputed credit expenses in constructed value, without adjustment for inflation, was necessary to

> reflect[ ] the opportunity cost of making a sale today for which payment will be received at a future date. As a matter of practice, [Commerce] calculates the imputed credit cost and includes it in the CV calculation as a selling expense. Imputed credit is not intended in any way to adjust the sale price for inflation.

Def.'s Mem. in Partial Opp'n to Pls.' Mot., Ex. 15, at 7 (Commerce Mem. to Barbara R. Stafford from David L. Binder).

Commerce, however, in this hyperinflationary situation, is calculating profit based upon a credit expense that may be totally unrelated to an appropriate constructed value for the exported merchandise. This calculation is to be reconsidered and Commerce shall explain the rationale for whatever methodology it chooses to apply.

## II. *AIMCOR's Contentions:*

### A. Calculation of imputed U.S. credit expenses:

The relevant statutory provision relating to circumstances of sale ("COS"), provides:

> In determining [FMV], if it is established to the satisfaction of the administering authority that the amount of any difference between the [USP] and the [FMV] * * * is wholly or partly due to—
>
> \*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*
>
> (B) other differences in circumstances of sale; * * *
>
> \*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*
>
> then due allowance shall be made therefor.

19 U.S.C. § 1677b(a)(4) (1988) (current version at 19 U.S.C.A. § 1677b(a)(6)(C)(iii) (West Supp. 1995)). Pursuant to this provision, Commerce adjusted the FMV of Minasligas' merchandise to account for negative imputed credit expenses, or credit revenue, arising from its financing of U.S. sales. *Final Det.* at 735. According to Commerce's practice, credit expenses are calculated from the shipment date of the merchandise to the date payment is received from the customer. *See, e.g., Granular Polytetrafluoroethylene Resin from Japan,* 58 Fed. Reg. 50,343, 50,344 (Dep't Comm. 1993) (final). Negative credit expenses, or credit revenue, is used to offset credit expenses when "sales are paid for prior to shipment," *see Antidumping Manual* ch. 8, at 19, the rationale being, according to defendant, that payment received prior to shipment provides an additional transactional benefit to the seller.

---

[14] The allegedly erroneous imputed credit expense is later replaced with an imputed credit expense for U.S. sales. *Antidumping Manual* ch.8, at 56–57. Thus, only the profit calculation is at issue.

Upon confirmation of an order from a U.S. customer, Minasligas received a bank loan, equal to the shipment price, under advance exchange contracts ("AECs") prior to shipment and prior to actual payment by the purchaser. *See* Concurrence Mem. at 21. Commerce determined that the interest charged on the advance loan constituted a negative imputed credit expense, or credit revenue, for the period between the bank's payment to Minasligas until shipment of the merchandise, concluding that the date Minasligas received AEC funds was equivalent to receipt of payment from the customer. *Amended Final Det.* at 8598; Concurrence Mem. at 21. Thus, for this pre-shipment period, Commerce added this "negative credit" expense to FMV.

AIMCOR contends that Commerce failed to calculate properly Minasligas' imputed U.S. credit expenses upon two bases: (1) Commerce erred in treating the first date on which Minasligas received the AEC bank loans as the date of payment by the customer, and (2) Commerce failed to use the proper interest rate in determining Minasligas' imputed U.S. credit expenses, arguing that application of a cruzeiro-denominated interest rate to a U.S. dollar-denominated USP is unsupported by substantial evidence.

In support of its argument that receipt of AEC funds does not constitute advance payment from the customer, AIMCOR cites *Industrial Nitrocellulose from Brazil,* 55 Fed. Reg. 23,120, 23,122 (Dep't Comm. 1990) (final), where Commerce disallowed a claim for negative imputed credit expenses. In that determination, Commerce found that the respondent's claim to advance payment from a customer

> was, in fact, the date that [respondent] borrowed money which was to be repaid with the proceeds from *future unspecified export sales.* Since we have determined that these U.S. sales were not, in fact, paid for in advance, * * * there should not be a negative credit expense adjustment.

*Id.* at 23,122 (emphasis added). The court does not agree with AIMCOR's contention, however, that in *Industrial Nitrocellulose* Commerce found the date of receipt of pre-shipment loan funds could not constitute the date of payment by the customer. Rather, the determination makes clear that the respondent's inability to tie the advance funds to payment from specific U.S. sales warranted disallowance of the claimed adjustment.[15] *Id.* On the other hand, defendant points to no determination where Commerce has treated advance pre-shipment loan funds as receipt of payment from a customer.

At oral argument, defendant indicated that Commerce used the negative imputed credit expense incurred under the AEC loans as an offset to the imputed credit expenses calculated from the date of receipt of the

---

[15] AIMCOR now alleges that Minasligas' receipt of advance funds under the AECs was not specifically tied to its export sales. Although the verification report in this investigation noted that Minasligas' AECs "are tied to specific sales," Pls.' Conf. App. to Reply Br., App. 7, at 9, AIMCOR contends that a review of the AECs only indicates the name of one customer and one product for each contract. According to AIMCOR, no reference in the AECs is made to specific U.S. sales, invoices or other sales documents, thus the negative credit expense adjustments should be disallowed. As AIMCOR challenges this finding for the first time here, the court declines to address this issue.

loan to the date of actual payment by the customer. Minasligas reported, and Commerce later verified, the credit expenses incurred under the AECs as a direct selling expense. Def.'s Mem. in Partial Opp'n to Pls.' Mot. at 12 n.10. Commerce further noted that it "accounted for actual expenses associated with the [AECs] by making a circumstance of sale adjustment to [FMV]." *Amended Final Det.* at 8598. According to defendant, Commerce apparently utilized the negative imputed credit expenses as the offset amount in lieu of any short-term income Minasligas would receive from early receipt of the loan funds. The court finds no error with Customs' calculation in this regard.[16]

As to AIMCOR's contention that Commerce failed to use the proper interest rate in determining Minasligas' imputed U.S. credit expenses, Commerce does not object to remand on this issue. Thus, Commerce is directed to apply a U.S. dollar-denominated interest rate in calculating Minasligas' imputed U.S. credit expenses.

### B. Commerce's adjustment to Minasligas' interest expenses for "monetary correction of loans" in COP and CV:

After calculating interest expenses on a consolidated basis for Minasligas and its parent company, Delp Engenharia Mecanica, S.A. ("Delp"), Commerce made an offset to the interest expenses for "monetary correction of loans." AIMCOR contends that Commerce erred in making this adjustment because the offset amount was neither verified nor shown to be related to the interest expenses. Specifically, AIMCOR asserts that interest expenses and the offset amount were derived from separate financial statements. In addition, the offset amount, according to AIMCOR, contained other expense items unrelated to the monetary correction. Finally, AIMCOR contends that as Minasligas' and Delp's financial statements are in accordance with Brazilian GAAP, which does not make a monetary correction for financial expenses as its does for certain other expenses, no adjustment is warranted here.

In accordance with its normal practice, Commerce determined that the calculation of financial expenses should be adjusted to compensate for the effects of hyperinflation so that actual interest expenses are reflected. *Amended Final Det.* at 8599; *see Frozen Concentrated Orange Juice from Brazil,* 52 Fed. Reg. 8324, 8327 (Dep't Comm. 1987) (final) ("We have [made] * * * an adjustment to the financial expenses so that only the actual interest expenses have been included."). According to defendant, such an adjustment was appropriate in this case because

---

[16] AIMCOR also notes that on the date certain AECs were executed, Minasligas did not receive the full shipment price, but rather a partial payment as the first payment, with the balance to be received very shortly after the date of shipment. *See* Concurrence Mem. at 21. Thus, AIMCOR contends that the first payment date should not be considered the date of payment by the customer. The court disagrees. Commerce verified that "Minasligas received all payments which were in increments of [a set monetary amount] on the 'First Payment' date. The remaining amount due to Minasligas (amounts less than [the set monetary amount]) was settled on the 'Last Payment' date reported for the sale examined." *Id.* As the vast majority of payments were made on the First Payment date and the delay was very minor, the court finds no error in Commerce's approach. *See, e.g.,* Pls.' Conf. App. to Reply Br., App. 5, at 4; Concurrence Mem. at 21.

Brazilian banks indexed loan principal balances to the inflation rate.[17] The record indicates that monetary corrections made to compensate for inflation in Minasligas' financial statements were made only to fixed assets and shareholders' equity. *See* Def.'s Mem. in Partial Opp'n to Pls.' Mot., Ex. 7, at 85, 89. Brazilian GAAP apparently did not require a similar monetary correction for financial expenses, thus Commerce determined a monetary correction based upon best information available ("BIA").

In the final determination, Commerce selected a monetary correction that was admittedly not wholly accurate. To determine the appropriate adjustment, Commerce relied upon the "Interest and Monetary and Cambial variations of the long-term payables" segment of the consolidated financial statement. Def.'s Mem. in Partial Opp'n to Pls.' Mot. at 23 n.20. The only evidence proffered by defendant in support of this selection is an indication from the section title of the financial statement, which defendant interpreted to mean that "any hyperinflationary 'variations' to debt were contained within its scope." *Id.*

Nevertheless, the court cannot sustain Commerce's resort to BIA in this manner for selection of this monetary correction. This information was not requested from Minasligas, and there is no indication from the record that Minasligas could not provide this data. Further, the evidence supporting a monetary correction on the basis that Minasligas' loans were indexed for inflation is uncertain. On remand, Commerce is directed to request data from Minasligas as to the appropriate monetary correction for loans, and if that data is inadequate or not provided, to reconsider its selection of BIA.[18]

### C. Exclusion of taxes from CV for CBCC and Minasligas:

For purposes of calculating the cost of materials or "inputs," in determining constructed value, Commerce is required to exclude

> any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used.

19 U.S.C. § 1677b(e)(1)(A) (1988) (current version at 19 U.S.C.A. § 1677b(e) (West Supp. 1995)). In the final determination, Commerce excluded certain Brazilian ICMS and IPI value-added taxes for inputs in

---

[17] The only evidence in the record supporting this finding is a statement in a case brief submitted by Minasligas in the underlying administrative proceeding. Def.'s Mem. in Partial Opp'n to Pls.' Mot., Ex. 5, at 4. Defendant also cites an accounting text indicating that Brazil adopted a system of monetary correction, or "indexing," in 1964. *See* Def.'s Mem. in Partial Opp'n to Pls.' Mot. at 15 n.12. The record does not indicate, however, the actual "monetary correction of loan principal" made in this case.

[18] AIMCOR further contends that Commerce made a double adjustment to arrive at actual interest expenses, thereby understating the amount of interest expenses included in COP and constructed value. In the final determination, in order to avoid overstating financing charges, Commerce "applied the interest expense ratio to each month's [cost of manufacture] calculated on a historical basis rather than amounts computed under the replacement cost basis." *Final Det.* at 737. According to AIMCOR, both this adjustment and the adjustment for monetary correction for loans were made for the same purpose. On remand, Commerce is to reconsider whether this interest expense adjustment and its selection, if any, of an adjustment for monetary correction for loans understates Minasligas' interest expenses included in COP and constructed value.

the calculation of constructed value. *Final Det.* at 737. Commerce determined that

> when using CV as a surrogate for home market prices we must determine if in fact the entity under investigation is able to recover all of the taxes paid on inputs (raw materials) from its domestic sales of subject merchandise. If domestic sales of subject merchandise fully recover all of the domestic taxes paid on inputs, then these taxes would appropriately be excluded from the margin analysis. However, if the producer is not able to recover all input taxes from its sales of subject merchandise, then these actual costs must be reflected in the CV.

*Id.* Commerce found that Minasligas and CBCC, though paying ICMS and IPI taxes for inputs, also collected these same taxes on sales to home market customers. *Id.* These manufacturers were required to remit taxes collected upon home market sales to the Brazilian government, but only to the extent that they exceeded the taxes already paid on purchases of inputs. *Id.* As value-added taxes for export sales were found to be fully recovered by home market sales, Commerce excluded them from the constructed value calculation. *Id.*

AIMCOR argues that these value-added taxes were not remitted or refunded to either CBCC or Minasligas upon the exportation of the merchandise, thus under the statute the taxes must be included. Defendant concedes that these value-added taxes are not refunded or remitted upon exportation, but defendant also contends that because the taxes were fully recovered by domestic sales of the product, exclusion from constructed value is still appropriate.

The statute on its face is clear in its requirement that internal taxes remitted or refunded upon export are to be excluded from the calculation of constructed value. The court disagrees, however, with AIMCOR's contention that the statute provides only this instance in which taxes upon inputs will not constitute "cost of materials." The statute requires the inclusion in constructed value, *inter alia,* of the cost of materials "at a time preceding the date of exportation of the merchandise." 19 U.S.C. § 1677b(e)(1)(A). In a tax scheme such as Brazil's, a respondent may be able to show that a value-added tax on inputs did not in fact constitute a "cost of materials" for the exported product. For example, a respondent that has fully recovered value-added taxes upon input costs prior to exportation, has not in fact incurred the value-added tax as a "cost of materials."

Here, Commerce has not alleged this to be the case. Rather, Commerce asserts that if a respondent is able to recover all taxes paid upon the inputs at issue, then exclusion of these taxes is necessary to prevent an overstatement of costs. It is apparent from the face of the statute, however, that material costs, such as value-added taxes, must be included in constructed value if they are in fact incurred prior to exportation, with the exception of taxes remitted or refunded upon exportation of the merchandise. Thus, this issue is remanded to Com-

merce to determine whether Minasligas' value-added taxes on the inputs at issue were fully recovered prior to exportation of the subject merchandise.[19]

### CONCLUSION

For purposes of the COP test, Commerce's treatment of Minasligas's home market "credit expenses" is remanded for correction of errors in accordance with this opinion. As to the calculation of constructed value, Commerce is directed to reconsider its treatment of imputed home market credit expenses for purposes of the impact upon the profit calculation. Minasligas' calculation of imputed U.S. credit expenses is remanded for application of a U.S. dollar-denominated interest rate. Finally, the court remands the adjustments for monetary correction of loans and for value-added taxes.

As new data may be requested, remand results are due within 90 days hereof. Any comments on the results are due 20 days thereafter. Any response is due 15 days thereafter.

---

[19] AIMCOR alleges that Minasligas' value-added tax on inputs was not fully recovered by domestic sales, thus Commerce erred in excluding such taxes from constructed value. In the verification report, Commerce examined Minasligas' ICMS payment records for the period from May 1 through December 31, 1992. *See* Pls.' Conf. App. to Reply Br., App. 7, at 14. The period of investigation ("POI") extended from July 1 through December 31, 1992. The verification report noted that, under Brazil's tax scheme, "if Minasligas owes the government, it makes a payment by the 15th workday of the following month. If the government owes Minasligas, Minasligas simply carries the balance forward into the next month." *Id.* Although the circumstances under which the government would pay Minasligas is unclear, the report indicated that "Minasligas owed the government in May [1992] and had a credit to carry forward for the rest of the POI." *Id.* AIMCOR apparently correctly contends that, at least for ICMS taxes, Minasligas' domestic sales did not fully recover value-added taxes incurred during the POI. On remand, Commerce is directed to address this issue in its consideration of cost of materials.